OLSHAN GRUNDMAN FROME
ROSENZWEIG & WOLOSKY LLP
Park Avenue Tower
65 East 55th Street
New York, NY 10022-1106
212.451.2300
Michael S. Fox
Eric L. Goldberg
Jordanna L. Nadritch

*Counsel for Ad Hoc Committee of Brokers*

UNITED STATES BANKRUPTCY COURT
THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| GRUBB & ELLIS COMPANY, et al. | Case No. 12-10685 (MG) |
| Debtors. | (Jointly Administered) |

## THE AD HOC COMMITTEE OF BROKERS'
### (i) STATEMENT OF ISSUES PRESENTED ON APPEAL, AND
### (ii) DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

Pursuant to Federal Rule of Bankruptcy Procedure 8006, members of the Ad Hoc

Committee of Brokers (collectively, the "Appellants")[1], by and through their counsel, Olshan

Grundman Frome Rosenzweig & Wolosky LLP, hereby submit the following designation of

items to be included in the record on appeal and statement of issues to be presented in connection

with the Notice of Appeal to the United States District Court for the Southern District of New

York, dated March 27, 2012, filed by the Appellants with the United States Bankruptcy Court for

---

[1] The Appellants include: Elaine R. Battagia, John W. Beers, Eric J. Berggen, Simon Clark, Conor Coakley, Andrew P. Connolly, David Cravath, Jeffrey D. Cristal, Vince D'Amico, Kyle Eaton, Gerald Z. Gibian, Neal (Dan) Gronich, Marilyn Hansen, Eric Haskins, Jeffrey Hyman, Alex T. Jelepis, Michael Kammerling, Bill B. Kanter, John C. Kinsella, Robert E. Lee, Jonathan Miller, Michael R. Myrick, Trevor Patterson, Deborah Perry, J. Gilbert Plavcan, Jerry (Marshall) Putterman, Kevin J. Riley, Richard Rosenthal, Steven L. Roth, Ira Rovitz, William D. Saltzman, Robert S. Shapiro, Robert Shuster, Anne Deason Spencer, Barrett Stern, Dean Tselepis, Alfred Twainy, Joel Wechsler, Alan Weissman, Robert D. Yaffa, and David F. Zwang.

the Southern district of New York from the order entered in the above-captioned actions, also dated March 27, 2012 (the "Order") by the United States Bankruptcy Court for the Southern District of New York (Hon. Martin Glenn).

## STATEMENT OF ISSUES

1.      Whether the Bankruptcy Court had the authority under section 363 of the Bankruptcy Code (11 U.S.C. § 363), to authorize the sale of brokerage commissions to be paid after the closing of the sale to BGC Partners, Inc. "free and clear" of any obligation to pay a portion of the commissions to the Debtors' individual broker/agents, as is required pursuant to each broker/agent's individual agreement with the Debtors?

## DESIGNATION OF CONTENTS OF RECORD

2.      The Appellants designate the following items for inclusion in the record on appeal:

| Designation Number | Docket No. | Filing Date or Document Date | Description |
|---|---|---|---|
| 1 | 12 | 02/20/2012 | Debtors' Motion for Entry of (I) An Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of Substantially All of the Debtors' Assets (B) Approving the Form and Manner of Notice, (C) Scheduling An Auction and A Sale Hearing and (D) Approving Procedures for Determining Cure Amounts and (II) An Order Authorizing and Approving the Sale of Substantially All of the Debtors' Assets |
| 2 | 66 | 03/01/2012 | Debtors' Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code to Authorize Payments to Cooperating Brokers |

1619796-1

| Designation Number | Docket No. | Filing Date or Document Date | Description |
|---|---|---|---|
| 3 | 80 | 03/04/2012 | Debtors' Omnibus Response to Objections to Debtors' Motion for, Inter Alia, Entry of an Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of Substantially All of the Debtors' Assets, (B) Approving the Form and Manner of Notice, (C) Scheduling an Auction and a Sale Hearing and (D) Approving Procedures for Determining Cure Amounts |
| 4 | 85 | 03/05/2012 | Notice of Filing of Schedules and Related Attachments to Asset Purchase Agreement Dated March 2, 2012 |
| 5 | 94 | 03/07/2012 | Order Signed on 3/7/2012 (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of Substantially All of the Debtors' Assets (B) Approving the Form and Manner of Notice, (C) Scheduling An Auction and A Sale Hearing and (D) Approving Procedures for Determining Cure Amounts and (II) An Order Authorizing and Approving the Sale of Substantially All of the Debtors' Assets |
| 6 | 95 | 03/07/2012 | Debtors' Amended Motion Pursuant to Sections 363(b) and 503(c) of the Bankruptcy Code for an Order Authorizing Implementation of a Broker Loan Program and Reimbursement of Expenses |
| 7 | 112 | 03/12/2012 | Objection And Reservation Of Rights Of The Ad Hoc Committee Of Brokers With Respect To The Debtors Amended Motion Pursuant To Sections 363(B) And 503(C) Of The Bankruptcy Code For An Order Authorizing Implementation Of A Broker Loan Program And Reimbursement Of Expenses |
| 8 | 113 | 03/12/2012 | Objection And Reservation Of Rights Of The Ad Hoc Committee Of Brokers With Respect To The Debtors Motion Pursuant To Sections 105(a) And 363(b) Of The Bankruptcy Code To Authorize Payments To Cooperating Brokers |

| Designation Number | Docket No. | Filing Date or Document Date | Description |
|---|---|---|---|
| 9 | 121 | 03/13/2012 | Debtors' Omnibus Reply to the Objections and Joinder Filed on Behalf of: (I) Jeffrey Sweeney and Anne Deason Spencer; (II) The Ad Hoc Committee of Brokers; (iii) And Certain Brokers to Debtors' Amended Motion Pursuant to Sections 363(b) and 503(c) of the Bankruptcy Code for an Order Authorizing Implementation of a Broker Loan Program and Reimbursement of Expenses |
| 10 | 122 | 03/13/2012 | Debtors' Reply to the Objection Filed on Behalf of the Ad Hoc Committee of Brokers to Debtors' Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code to Authorize Payments to Cooperating Brokers |
| 11 | 123 | 03/13/2012 | Declaration of Michael J. Rispoli in Further Support of (i) Debtors Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code to Authorize Payments to Cooperating Brokers and (ii) Debtors' Amended Motion Pursuant to Sections 363(b) and 503(b) of the Bankruptcy Code for an Order Authorizing Implementation of A Broker Loan Program and Reimbursement of Expenses |
| 12 | 162 | 03/15/2012 | Order signed on 3/15/2012 Authorizing the Debtors to Pay Cooperating Brokers |
| 13 | 238 | 03/16/2012 | Limited Objection to Motion for Order Approving the Sale of Substantially All of the Debtors' Assets |
| 14 | 239 | 03/16/2012 | Statement Seeking Clarification And Reservation Of Rights Of The Ad Hoc Committee Of Brokers With Respect To The Debtors Motion For An Order Authorizing And Approving The Sale Of Substantially All Of The Debtors' Assets |

4

| Designation Number | Docket No. | Filing Date or Document Date | Description |
|---|---|---|---|
| 15 | 626 | 03/19/2012 | Transcript regarding Hearing Held on Wednesday, March 14, 2012 at 4:18 PM RE: Debtors Amended Motion for an Order Authorizing Implementation of a Broker Loan Program and Reimbbursement of Expenses; Debtors Motion to Approve Amendments to (I) Interim Financing Order Pursuant to 11 U.S.C. 105, 361, 362, 363, 364 and 507, Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure, and (II) the DIP Facility; Debtors Motion to Authorize Payments to Cooperating Brokers |
| 16 | 763 | 03/21/2012 | Debtors' Omnibus Response to Objections to Debtors' Motion for Entry of an Order, Inter Alia, Authorizing and Approving (I) the Sale of Substantially All of the Debtors' Assets and (II) the Assumption and Assignment of Executory Contracts and Unexpired Leases |
| 17 | 764 | 03/21/2012 | Declaration of Marc Liebman in Support of Debtors' Motion for Entry of an Order Authorizing and Approving the Sale of Substantially All of the Debtors' Assets and In Response to Objections thereto |
| 18 | 765 | 03/21/2012 | Declaration of Michael J. Rispoli In Further Support of Debtors' Motion for Entry of an Order Authorizing and Approving the Sale of Substantially All of the Debtors' Assets and In Response to Objections thereto |
| 19 | 778 | 03/21/2012 | Notice of Filing of Stipulation and Settlement Among the Debtors, the Creditors' Committee and BGC Partners, Inc. |

1619796-1

| Designation Number | Docket No. | Filing Date or Document Date | Description |
|---|---|---|---|
| 20 | 779 | 03/21/2012 | Statement of Official Committee of Unsecured Creditors in Support of the Debtors' Motion for Entry of (I) an Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of Substantially All of the Debtors' Assets, (B) Approving the Form and Manner of Notice, (C) Scheduling an Auction and a Sale Hearing and (D) Approving Procedures for Determining Cure Amounts and (II) an Order Authorizing and Approving the Sale of Substantially All of Debtors' Assets |
| 21 | 780 | 03/21/2012 | Declaration of Samuel E. Star in Support of the Proposed Sale of Substantially All of the Debtors' Assets to BCG Partners, Inc. |
| 22 | 822 | 03/19/2012 | Transcript regarding Hearing Held on Monday, March 5, 2012 at 3:31 PM RE: Evidentiary Hearing RE: Approval of Bid Procedures; Status Conference RE: Debtors' Motion for an Order Authorizing Implementation of a Broker Loan Program and Reimbursement of Expenses; Debtors' Motion to Authorized Payments to Cooperating Brokers; Debtors' Motion to Approve Amendments to (I) The Interim Financing Order, and (II) The DIP Facility |
| 23 |  | 3/22/2012 | Transcript regarding Hearing Held on Thursday, March 22, 2012 at 3:00 p.m. re: Debtors' Motion For an Order, Inter Alia, Authorizing the Sale of Substantially All of Their Assets and Granting Related Relief |
| 24 | 829 | 03/27/2012 | Written Opinion signed on 3/27/2012 Approving the Sale of Substantially all of the Debtor's Asset |
| 25 | 830 | 03/27/2012 | Order Signed on 3/27/2012 Authorizing (A)the Sale of Substantially all of the Debtors' Assets Free and Clear of all Claims, Liens, Rights, Interests and Encumbrances; (B) the Debtors to Enter Into and Perform Their Obligations Under the Asset Purchase Agreement; and (C) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases |

6

| Designation Number | Docket No. | Filing Date or Document Date | Description |
|---|---|---|---|
| 26 | 831 | 03/27/2012 | So Ordered Stipulation signed on 3/27/2012 Among to Debtors, the Creditors' Committee and BGC Partners, Inc |
| 27 | 837 | 03/27/2012 | Notice of Appeal from the Order Authorizing (A) the Sale of Substantially All of the Debtors' Assets Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances; (B) the Debtors to Enter Into and Perform Their Obligations Under the Asset Purchase Agreement; and (C) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases |
| 28 | n/a | | Grubb & Ellis Real Estate Professional Employment Agreement with Addendum |
| 29 | n/a | | Grubb & Ellis Commercial Independent Contractor Agreement |

Dated: April 10, 2012
      New York, New York

          **OLSHAN GRUNDMAN FROME ROSENZWEIG & WOLOSKY LLP**

          /s/ Michael S. Fox

          Park Avenue Tower
          65 East 55th Street
          New York, New York 10022
          Michael S. Fox
          Eric L. Goldberg
          Jordanna L. Nadritch
          (212) 451-2300

          *Counsel for Ad Hoc Committee of Brokers*

1619796-1



**Grubb&Ellis**
Property Solutions Worldwide℠

## GRUBB & ELLIS REAL ESTATE PROFESSIONAL
## EMPLOYMENT AGREEMENT

GRUBB & ELLIS COMPANY, a Delaware corporation, or its subsidiary named below (the "Company") is entering into this employment agreement (the "Agreement") with _____ ("you") effective on _____, _____ ("Effective Date"). You and the Company will be referred to together in this Agreement as "we." We will enter into an addendum to this Agreement which will provide details of your compensation (the "Addendum"). In consideration of the promises and mutual agreements in this Agreement, we agree as follows:

1.  **YOUR POSITION.** The Company, which is licensed as a real estate broker, agrees to employ you as a real estate professional in the capacity of a real estate salesperson or associate broker, beginning on the Effective Date. Your initial supervisor will be the manager signing this Agreement. You are licensed in the State of _____ as a real estate _____, under License Number _____ with the next renewal date of _____: Additional licenses held by you:_____

    _____

    [type of license, state, number, expiration date].

2.  **TERM OF THIS AGREEMENT; AT-WILL RELATIONSHIP.** This Agreement starts on _____, _____ and will continue until your employment ends. We agree that your employment relationship is at-will; that is, either you or the Company may terminate the employment relationship at any time for any or no reason, with or without cause or advance notice. This term of your employment cannot be modified except in a writing signed by the Chief Executive Officer of the Company or by a person designated in writing by the Chief Executive Officer.

3.  **THE DUTIES OF YOUR POSITION.** You agree to perform real estate transactional services for the Company and for the Company's clients on behalf of the Company. You agree to work on a full-time basis and to devote your full time, attention and energy to the business of the Company. Your duties will be determined from time to time by your supervisor and will include the following:

    A.  **Real Estate Services.** You agree to consummate through the Company and its subsidiaries and Affiliates (together, "G&E Family") all real estate transactional and other services opportunities available to you. An "Affiliate" is a real estate firm or person with whom the Company or one of its subsidiaries has entered into a real estate brokerage affiliation agreement. You agree that all listings of property, all representations of clients, and all other real estate services opportunities encountered by you and accepted by the Company and/or another member of the G&E Family will be conducted in their name and for their benefit. You agree to contribute all rights to such opportunities to the Company. It is an important condition of your employment and an expectation of the Company that you consistently produce a high level of earnings to the Company from closing real estate transactions ("production"). "Gross

Production Goal" refers to the amount of gross commissions credited to you within a calendar year. "Gross commission" for all purposes of this Agreement and any addenda means the total amount of a real estate commission earned by and paid to the Company which is credited to you, after deduction of expenses and referral fees payable to other Company divisions, associates or Affiliates. You are expected to meet the Gross Production Goal set forth in the attached Addendum in each calendar year to which the Addendum applies. Failure to achieve the Gross Production Goal established for you could result in termination of your employment. You are responsible for tracking your progress toward achievement of the Gross Production Goal.

B. **Assignments.**   In its business judgment and in order to best serve the needs of its clients, the Company reserves the right to assign to any of its real estate professionals, including you, any and all transactions, opportunities, specialties and territories in which its real estate professionals will perform services, and to change such assignments, whether or not an opportunity was initiated by you or you were otherwise involved. You agree to abide by any such assignments or changes to assignments and to diligently fulfill any assignments given to you. The Company also reserves the right to designate any of its professionals, associates or employees to assist you on either an exclusive or a non-exclusive basis and to terminate or change that designation.

C. **Referrals By You.** In the event that your supervisor determines, in his or her sole discretion, that a real estate services opportunity is not appropriate for you to perform, the Company reserves the right to do one of the following, as applicable: a) refer the opportunity to the appropriate office or person in the G&E Family, for which you may be eligible for a referral fee under the Company's Referral Policy then in effect; or b) turn over the matter to a designated person in your Office.

4.    BUSINESS CONDUCT.

A. **Following the Law.** You agree that in the performance of your services hereunder you will not discriminate against or harass anyone on the basis of race, religion, color, gender, age, disability, national origin or as otherwise prohibited by law. You agree to comply with all applicable laws, regulations and codes of ethics, including real estate laws and regulations.

B. **Instructions; Authority.** You agree to follow specific instructions from your supervisor(s), his/her superiors, and his/her delegates, relating to how to perform your job. You acknowledge that, notwithstanding any title which you may be given, you have no authority to bind the Company to any promise or representation unless you are authorized to do so in a particular transaction, in writing, by your supervisor or his/her superior.

C. **Policies.** You agree to perform your job in accordance with Company standards and policies as set forth in the Grubb & Ellis Company Commercial Salesperson's Policy and Procedures Manual (the "Manual"), the Grubb & Ellis Employee Handbook (the "Handbook"), any other policy writings of the Company, as they are amended from time to time. All of these together will be referred to as the "Policies." If there is a

conflict in the following documents, they will prevail in this order: the Agreement, then the Manual, then the Handbook. You acknowledge that you have received a copy of the Manual and the Handbook.

D. **Location of Services.** The Company office (the "Office") to which you are assigned is named at the end of this Agreement. You agree that the nature of your job requires that you perform your job predominantly outside the Office and that at least 80% of your time will be spent on real estate services activities, including, among other things, sales activities.

E. **Refrain from the Following.** You agree that you will not:

    (i)    engage in any real estate services which:

- the Company, in its sole discretion, determines are not appropriate for you personally to perform; or
- the Company has assigned to another person to perform; or
- are not undertaken in the name of and on behalf of the Company.

    (ii)    make any agreements:

- with any client of the Company related to payment of fees or commissions without the Company's written consent; or
- with any third party for the division of any commission or fee, without the Company's written consent; or
- which specify the payment of any commission or fee directly to you for the performance of services hereunder.

You agree that in the event that you make any agreement in breach of the above paragraph (ii) which results in the Company receiving less than full payment of its commission or fee, the amount of any such discount will be entirely deducted from your share of the commission.

    (iii)    in the course of your employment, accept any fees for referrals to architects, contractors, moving companies, environmental consultants or any other type of business, other than referral fees paid under the Company's Referral Policy.

    (iv)    hire or pay directly any persons to assist you in the performance of your duties hereunder.

F. **The Company's Prerogative.** You agree that the Company has the sole and absolute right to determine:

    (i)    the commission or fee to be charged to any client and the terms and conditions under which such commission or fee will be paid;

    (ii)    the division of any commission with any third party; and

(iii)   whether it will abandon or negotiate the settlement of, or prosecute or refuse to prosecute an action for, the collection of any commission claim or any other claim against a third party related to the Company's business. If the Company decides to pursue collection of a commission and you elect to join in the collection effort, you agree to pay 50%, or such lesser percentage determined by the Company on account of the participation of others in the collection, of the attorneys' fees and costs associated with such collection as such amounts become due, whether or not the collection effort is successful. If you have joined in the collection and paid your share of the expenses, you will be entitled to same percentage of the net proceeds of such collection as equals your share of costs.

## 5.   MAINTAINING YOUR QUALIFICATION TO WORK.

A.  **Your Real Estate License.** You agree to maintain your real estate license for the state in which your Office is located in active status and good standing at all times while you are employed with the Company. You agree that you are responsible for renewal of your license prior to its expiration. See Paragraph 6.D below regarding reimbursement of certain fees related to your real estate license. If you let your license lapse, you will pay any costs of reinstatement of the license over and above the regular renewal fees.

B.  **Consequences of No License.** Failure to maintain your real estate license in good standing could result in termination of your employment with the Company. In addition, you agree not to perform services hereunder during any period in which your license is not in good standing. No compensation will be paid to you for services performed during any such lapse period.

## 6.   YOUR COMPENSATION AND BENEFITS.

A.  **Compensation and Benefits During Employment.**

(i)   **Compensation.** You will be paid compensation, including portions of real estate commissions, according to the attached Addendum to this Agreement, which is incorporated herein by reference. When commissions have been paid to the Company from the party(ies) for whom services are performed, a portion will thereafter be paid to you within a reasonable time following the Company's receipt of such commissions, according to the terms of the Agreement and Addendum, and Company Policies. In the event that you are eligible to receive a commission from exercise of an option or renewal of a lease, you are obligated, as a pre-requisite to receiving such a commission, to inform your supervisor of the particulars of the transaction, including the lease or other governing document, identity of the parties and the property, dates and amounts due within 30 days of the date that the commission is due to be paid to the Company. You agree to promptly forward to the Company any commission payment that you receive from a client or other third party in connection with your services hereunder. In no event will the Company or any other member of the G&E Family be liable to you for commissions not

collected, and the Company is entitled to waive or settle any commission claims, and otherwise decide whether or not to pursue collection of a commission. You will not be personally liable to the Company for any commission not collected unless the Company's claim to the commission is released or otherwise compromised by you without the prior written consent of the Company. You are not entitled to receive advances against commissions to be paid to you in the future, unless the Company agrees in writing to provide advances.

(ii)     Benefit Plans. We agree that you will be eligible to receive benefits similar to those provided to other regular employees of the Company, subject to such terms, including terms relating to eligibility and payment of employee contributions, as may be provided in such plans; provided, that you will not be eligible to receive paid time off, such as paid holidays, vacation, sick or other paid leaves of absence and termination allowances.

B.  Compensation After Employment Has Ended. You will receive portions of commissions received by the Company after the date that your employment ends ("Term Date"), under the following conditions:

(i)     For purposes of this Agreement, "Transaction" means a) a bona fide written offer to purchase or exchange an interest in real property which has been accepted in writing, with or without contingencies, b) a letter of intent or offer to lease, sublease or joint venture which has been accepted either orally (provided negotiations are substantially in progress) or in writing; or c) your active pursuit of a transaction described in subsection a) or b) above, pursuant to a signed, written agreement between the Company or a Related Entity and a third party for the provision of real estate services, such as a listing agreement or tenant representation agreement. "Transaction" also includes matters described in a), b) or c) above which you have referred to others under the Company's Referral Policy in effect at your Term Date, for which you request compensation. "Closing" or "Closed" means the consummation of the Transaction or close of the escrow or the execution of a lease, sublease or joint venture agreement related to real property.

(ii)     You must provide the Company with a written Termination Agreement ("TA") on such form and containing such terms and conditions as the Company designates, within ten days of your Term Date. **Your failure to include a particular Transaction or failure to deliver the TA on time will preclude you from receiving any compensation related to such Transaction after your employment has ended.** This TA must include a list of all Transactions in which you are actively involved and must indicate: a) Transactions which have Closed prior to your Term Date and for which you have not yet been paid ("Closed Transactions"); b) Transactions which have not yet Closed, including the exercise of an option or renewal of a lease which generates commissions to the Company and which relates to a Transaction for which you were previously compensated ("Pending Transactions"); and c) the names of any other Grubb & Ellis professional, office, division or other co-broker which may have an interest in each Transaction and the percentages of

the gross commission to which you believe that you and each of them are entitled. In your TA, you agree to include a narrative report stating all of the facts relating to each client and transaction with which you have been involved at your Term Date, in sufficient detail to enable the Company to understand the history and current status thereof and to professionally perform services in connection with such clients and transactions.

(iii)    Upon receipt of your TA by your supervisor, your supervisor will review the list of transactions and discuss with you any necessary modifications to the list, including adding or deleting transactions, limiting the transactions related to particular clients, and modifying the percentages and names of other interested parties. Upon signing of the TA by you and your supervisor, and delivery of the TA to you, the terms of the TA will be binding on you and the Company, and all commissions derived therefrom will be paid directly to the Company and you will receive a portion of such commissions according to the TA.

(iv)    Upon payment to the Company of real estate commissions and fees listed on your TA, you will receive a portion of the commission under the starting bracket of the Standard Program without regard to Accelerated Brackets as described in the Addendum in effect at your Term Date for any Closed Transaction and for any Pending Transaction which Closes within nine months of your Term Date or within such reasonable time thereafter as is agreed upon in writing by you and your supervisor according to the terms of the TA; provided, that such commission will be reduced to cover any outstanding Debt (see definition below) to the Company, to the extent permitted by law.

C.  **Debts to the Company.** You agree that any amounts you owe to the Company ("Debt") will be deducted from any compensation payable to you to the extent permitted by law. Debt includes but is not limited to advances made to you, amounts owing by you as an employee's contribution to benefits made available to you, and any other costs and expenses advanced on your behalf. Notwithstanding these deduction provisions, there may be independent consequences of non-payment or tardy payments of Debt according to the terms of the particular Debt, such as termination of benefits. Upon your Term Date, any Debt outstanding will be automatically converted to a demand loan and will be immediately due and payable in full, with interest on the outstanding amount accruing at the rate of the lesser of nine (9)% per year, or the maximum rate allowed by law, from your Term Date until paid, whether or not compensation earned by you after your Term Date is sufficient to repay the Debt. You agree to sign any reasonable documents deemed necessary to assure repayment of your Debt, including a promissory note in favor of the Company on or before your Term Date, containing your promise to repay the Debt.

D.  **Reimbursement of Expenses.** In order to receive reimbursement of expenses hereunder, you must comply with all provisions of the published Grubb & Ellis Expense Policy, as amended from time to time, including timely submission of evidence of expenses. Any expenses that are submitted out of compliance with the terms of this Agreement and such Expense Policy will not be reimbursed to you.

(i)      The Company will reimburse you for 100% of the regular application or renewal fees and continuing education costs for the real estate license you hold for the state in which your Office is located, and annual membership fees, up to a maximum of $250 per year, for either one board of realtors if customary for commercial real estate professionals in your local market, or for one or more trade associations approved by your supervisor.

(ii)     Business expenses incurred will be reimbursed solely at the discretion of the Company and: a) must be pre-approved in writing by your supervisor;  b) if the expense is a travel and entertainment expense, it will be reimbursed to you at the rate of 50% of the incurred expense; and c) all other expenses, including marketing expenses will be paid and/or reimbursed according to the provisions of the Expense Policy and the Manual; provided, that if an expense incurred by you exceeds an approved amount, you will be responsible for payment of the expense, either via direct payment or by recovery of the amount under the Debt provisions of Paragraph 6.C above.

7.     TRADE SECRETS AND CONFIDENTIAL INFORMATION.

A.    The Company considers all of the following information in any form to be trade secrets and/or confidential proprietary information belonging to the Company and the other members of the G&E Family ("Trade Secrets"), all of which are and have been developed with the expenditure of substantial time and resources by the Company, and which have been maintained in confidence:

(i)     real estate transaction, management, financing or consulting opportunities or listings, including but not limited to all listings of any and all properties or interests therein whether for sale, lease, encumbrance or other conveyance;

(ii)    the names and all other information concerning existing or potential clients which are not generally known and are not readily ascertainable;

(iii)   marketing, sales and other information included in any database developed by or for, or purchased by or for, the Company and/or other members of the G&E Family;

(iv)   any and all records, mailing lists, correspondence, memoranda, files, presentation formats, manuals, forms, procedural information and any other information.

B.    You agree that all Trade Secrets which you acquire while employed with the Company will remain the property of the Company and will not be disclosed or used by you during or at any time after your employment terminates except in the course and scope of your employment with the Company and in a manner that preserves the Company's rights to the Trade Secrets. Your disclosure, removal (including copies) or use of Trade Secrets without the prior written consent of your supervisor or otherwise in an unauthorized manner is grounds for immediate termination of your

employment, and the Company will be entitled to injunctive relief and/or damages at its election.

C. Anything considered a Trade Secret which you develop while you are employed with the Company is considered "Work Product." You agree to assign all Work Product to the Company and that all Work Product will belong exclusively to the Company. The Company may register its copyrights and take other protective action in relation to Trade Secrets and Work Product and you agree to assist the Company in perfecting such protection. You also agree that you will not contribute or develop anything that otherwise would be considered Work Product if it would violate the rights of any third party.

8.    **RETURN OF COMPANY PROPERTY.** You agree to return to the Company all Trade Secrets, Work Product, computer equipment, software and all other property of the Company when requested to do so by the Company, or by your Term Date, or within five calendar days of your Term Date if your employment ends with no advance notice. You agree to advise the Company of the location of any such information which is not in the Company's or your possession and which you are unable to return. You will leave at the Office the originals and copies of all listings, client representation agreements, commission agreements, consulting contracts, purchase and sale agreements, leases, other transaction documents, canceled checks, trust records and other documents in connection with any transaction undertaken during your employment.

9.    **RESTRICTIONS AGAINST COMPETITION.**

A. You agree that during your employment with the Company and for a period of twelve months following termination of your employment with the Company, you will not:

(i)    solicit, directly or indirectly, or attempt to influence any person or firm with which the Company has an exclusive business relationship and which has an office or property interests located in your Market Area (defined on the last page of this Agreement), with the purpose or effect of diverting the client's business away from the Company;

(ii)    solicit, directly or indirectly, any of the Company's employees or professionals to leave the Company and associate with a real estate services firm located in or serving your Market Area; or

(iii)    hire, or cause to be hired, to associate with a real estate services firm located in or serving your Market Area, any person who was associated with the Company during the period beginning six months prior to your Term Date and ending six months following your Term Date.

You also agree that you will not become involved with the negotiations of any of the Company's real estate transactions, unless you have received the prior written consent of an authorized representative of the Company.

Notwithstanding the foregoing, if any court of competent jurisdiction decides that any provision, clause or subparagraph of Paragraph 9.A is unenforceable on any grounds,

employment, and the Company will be entitled to injunctive relief and/or damages at its election.

C. Anything considered a Trade Secret which you develop while you are employed with the Company is considered "Work Product." You agree to assign all Work Product to the Company and that all Work Product will belong exclusively to the Company. The Company may register its copyrights and take other protective action in relation to Trade Secrets and Work Product and you agree to assist the Company in perfecting such protection. You also agree that you will not contribute or develop anything that otherwise would be considered Work Product if it would violate the rights of any third party.

8. RETURN OF COMPANY PROPERTY. You agree to return to the Company all Trade Secrets, Work Product, computer equipment, software and all other property of the Company when requested to do so by the Company, or by your Term Date, or within five calendar days of your Term Date if your employment ends with no advance notice. You agree to advise the Company of the location of any such information which is not in the Company's or your possession and which you are unable to return. You will leave at the Office the originals and copies of all listings, client representation agreements, commission agreements, consulting contracts, purchase and sale agreements, leases, other transaction documents, canceled checks, trust records and other documents in connection with any transaction undertaken during your employment.

9. RESTRICTIONS AGAINST COMPETITION.

A. You agree that during your employment with the Company and for a period of twelve months following termination of your employment with the Company, you will not:

(i) solicit, directly or indirectly, or attempt to influence any person or firm with which the Company has an exclusive business relationship and which has an office or property interests located in your Market Area (defined on the last page of this Agreement), with the purpose or effect of diverting the client's business away from the Company;

(ii) solicit, directly or indirectly, any of the Company's employees or professionals to leave the Company and associate with a real estate services firm located in or serving your Market Area; or

(iii) hire, or cause to be hired, to associate with a real estate services firm located in or serving your Market Area, any person who was associated with the Company during the period beginning six months prior to your Term Date and ending six months following your Term Date.

You also agree that you will not become involved with the negotiations of any of the Company's real estate transactions, unless you have received the prior written consent of an authorized representative of the Company.

Notwithstanding the foregoing, if any court of competent jurisdiction decides that any provision, clause or subparagraph of Paragraph 9.A is unenforceable on any grounds,

such provision will be deemed amended to the extent necessary so that the remainder of Paragraph 9.A will be enforceable.

B. You acknowledge that the Company's willingness to employ you under this Agreement is in reliance on your assurance that you will not violate the provisions of Paragraph 9.A above. The period of protection and the geographical area specified have been carefully considered, and you agree that the period and area covered are reasonable and necessary to the protection of the Company's Trade Secrets and the conduct of the Company's business. If you break the promises in Paragraph 9.A, the Company will be entitled to an injunction against you in addition to any and all other relief to which the Company may be entitled at law or in equity. You agree that breaking these promises would cause the Company irreparable harm and that the Company lacks an adequate remedy at law, and you waive your right to insist that the Company prove such harm.

10. UNRELATED ACTIVITIES. Any of your activities which are not directly required hereunder and are not in the course and scope of your employment are considered "Unrelated Activities." Unrelated Activities include, but are not limited to, your participation in any capacity other than that contemplated by this Agreement in any real estate, insurance, securities or other business, or any partnership or joint venture, engaged in for profit or for any political, charitable, trade, professional or community organization or purpose. You agree that you will not undertake or permit any Unrelated Activities on your part to be undertaken in the name of the Company or using Company resources. You also agree that you will not represent or imply, and will not permit the representation or implication, that the Company supports your Unrelated Activities. If the Company asks you to provide the Company with information regarding, or disclaim the Company's involvement in, your Unrelated Activities, you agree to do so.

11. INDEMNIFICATION OF EACH PARTY TO THIS AGREEMENT.

A. Indemnification of You. The Company will defend and indemnify you for acts performed by you in the course and scope of your employment hereunder, subject to limits, exclusions and other terms and conditions of Company Policy as set forth in the Manual and other Policies distributed from time to time; provided, that the Company will not defend and indemnify you for claims against you by the Company, or arising from Unrelated Activities, from violations of laws, willful misconduct, grossly negligent acts or other acts outside the course and scope of your employment.

B. Indemnification of the Company. You agree to defend, indemnify and hold harmless the Company and the other members of the G&E Family and their respective officers, directors, shareholders, employees and agents from all actions, claims, damages, demands, losses, liabilities, costs and expenses, including attorneys' fees, arising from or related to:

    (i)    your Unrelated Activities; or

    (ii)    acts outside the course and scope of your employment, including, but not limited to, violations of law, regulations, or Company Policies; or

(iii)    unauthorized or grossly negligent acts, omissions and/or representations in the performance of services hereunder by you .

You agree to notify the Company of any matter referred to in this Paragraph 11, and the Company will have the right to select, direct and discharge any attorney which you or the Company is required to provide under this paragraph.

12.    RESOLVING DISPUTES.

A.  **Disputes Between You and Other Company Professionals.** If you have a dispute with one or more other Company real estate professionals relating to compensation to which any of you or they claims to be entitled (including disputes over commissions or referrals), you agree to resolve the dispute by binding internal arbitration in accordance with the procedures described in the Manual.

B.  **Disputes Between You and Another Division or member of the G&E Family.** Notwithstanding the foregoing provisions, in the event that you have a dispute with another Company division, or another member of the G&E Family, other than another Company real estate professional, regarding your commissions, referral fees or other compensation, and it cannot be resolved informally, you agree to submit your claim and requested relief to your supervisor in writing, who will respond to you within ten business days. If your supervisor supports your claim, your supervisor will, within ten business days of receipt of your claim, attempt to resolve the matter directly with the other Company division or other member of the G&E Family involved. Promptly after a solution is reached to the satisfaction of your supervisor, you will be notified of the settlement. If your supervisor is unsuccessful in reaching settlement, or if you are not satisfied with the supervisor's response to you or the settlement reached, you may appeal the matter directly to the individual to whom your supervisor reports ("Higher Supervisor"). The Higher Supervisor will determine, in his or her sole discretion, what action to take, which can include, but is not limited to: a) pursuing settlement of the claim with the highest level manager on the other side of the dispute; b) disallowing your claim; or c) such other action as he or she deems appropriate. You will be notified of the decision reached regarding your claim within ten business days of the Company's receipt of your appeal.

C.  **Disputes Between You and the Company.** Except as provided above in this Paragraph 12,, if either you or the Company has a dispute or claim regarding any terms of your employment with the Company, including your compensation structure, or if we have a dispute regarding this Agreement (including a dispute about these dispute resolution procedures), we agree to attempt to resolve the dispute by ourselves (with the assistance of the Human Resources Department if either party requests it). In the event that the dispute cannot be resolved in this way, we agree to submit the dispute to J.A.M.S/Endispute, its successor, or such other neutral party on which we agree (the "Neutral"), for mediation, and if the matter is not resolved through mediation, then we agree to submit it to a Neutral for final and binding arbitration. The provisions of this Paragraph 12 do not apply to: a) violations of Paragraphs 7, 9 and 11 of this Agreement, which may be resolved by injunction or other relief provided by a court of competent jurisdiction pursuant to the terms of this

Agreement; and b) claims for workers' compensation and unemployment benefits, which are covered by statutory legal procedures.

(i)     *Mediation.* Either you or the Company may begin mediation, after attempting and failing to resolve the issue between ourselves, by providing to the Neutral and the other party a written request for mediation, setting forth the subject of the dispute and the relief requested. We will cooperate with the Neutral, with one another in selecting a mediator, and in scheduling the mediation proceedings. We agree to participate in the mediation in good faith, and share equally in the costs of the mediation, including the mediator's fees; provided that each party will bear the fees and costs of its own attorneys. All offers, promises, conduct and statements made in the course of the mediation by either of us or our respective agents, experts and attorneys (if any) and by the mediator or any employees of the mediator, are confidential, privileged and inadmissible for any purpose, including impeachment, in any arbitration or other proceeding involving you and the Company; provided, that evidence that is otherwise admissible or discoverable will not be rendered inadmissible or non-discoverable as a result of using it in the mediation. The provisions of this paragraph may be enforced by any court of competent jurisdiction.

(ii)    *Arbitration.* Any dispute or claim which is the subject of this Paragraph 12 that is not resolved through mediation or otherwise will be submitted to final and binding arbitration before a Neutral pursuant to the United States Arbitration Act, 9 U.S.C. §1 *et. seq.* Either you or the Company may initiate arbitration with respect to the matters submitted to mediation by filing a written demand for arbitration up to 90 days after the initial mediation session or 30 days after the filing of the written request for mediation. The mediation may continue after the commencement of the arbitration if we both agree. Unless we otherwise agree, the mediator will be disqualified from serving as arbitrator in the case. Unless we otherwise agree, the arbitration will be conducted in accordance with the provisions of the applicable rules of J.A.M.S./Endispute: commission disputes will be conducted in accordance with the Streamlined Arbitration Rules and Procedures and other employment disputes will be conducted in accordance with the Employment Arbitration Rules and Procedures. In addition to and notwithstanding these Rules, we also agree that we will each cooperate in good faith to exchange all relevant documents and information in our respective control and that we will each have the right to take one deposition of the opposing party, and any other depositions by agreement or as deemed appropriate by the Neutral. We agree to cooperate with J.A.M.S./Endispute or other Neutral and with one another in selecting an arbitrator, and in scheduling the arbitration proceedings. In reaching his or her decision, the Neutral will follow and apply the applicable law. The Neutral will render a written decision that includes a written statement of the reasons for the decision and award, and the written statement will be admissible in any judicial proceeding to enforce or vacate the arbitration decision. We promise to participate in the arbitration in good faith and share equally in the costs of the arbitration, including the arbitrator's fees; provided that each party will bear the fees and costs of its own attorneys. The

provisions of this paragraph may be enforced by any court of competent jurisdiction.

D. Consent to Arbitration. By initialing the space below you agree to have all disputes or claims arising out of or relating to this Agreement and/or commissions decided by arbitration, and you are giving up any rights you might possess to have those matters litigated in a court or jury trial. By initialing the space below you are consenting to limiting your rights to discovery and appeal to those specifically provided for in the rules and procedures referenced in this Agreement. If you refuse to submit to arbitration after agreeing to this provision, you may be compelled to arbitrate under federal or state law. Your agreement with these arbitration provisions is voluntary.

_____[YOUR INITIALS]

13.   GENERAL PROVISIONS.

A. Auto Insurance. You agree to maintain insurance with liability limits of $100,000 per person and $300,000 per accident on all vehicles used by you within the course and scope of your employment, and agree to provide proof of such insurance upon the request of your supervisor or Business Operations Manager.

B. No Third Party Beneficiaries. Nothing in this Agreement shall be construed to confer any rights on any third party to avoid the payment of any fees or commissions to the Company, or to limit the rights of the Company with respect to payment of any such fees or commissions or to enforcement of any agreement with respect to third parties.

C. Notices. Notices regarding this Agreement must be in writing. Your supervisor is the person who must receive notice on behalf of the Company. Any notice to be delivered under this Agreement will be deemed delivered if either personally delivered or by certified mail, to the Company at the Office, and to you at your personal residence as reflected on Company records or at the Office.

D. This is the Whole Agreement. This Agreement, along with Addendum, the Handbook and the Manual – where they do not conflict with this Agreement and as they may be amended from time to time, contain the complete understanding of you and the Company regarding the terms of your employment with the Company. This Agreement supersedes any prior written or verbal understandings or agreements between you and the Company on the subjects covered hereunder. If any part of this Agreement is determined to be invalid or unenforceable, the rest of the Agreement will be given effect. The waiver by the Company of a breach of any provision of this Agreement by you will not operate or be construed as a waiver of any subsequent breach by you. Any such waiver to be effective must be in writing.

E. Amending this Agreement. Amendments or addenda to this Agreement must be in writing and must be signed by you and by an authorized Company representative (either your supervisor or his/her superior) to be effective.

F. Assigning this Agreement. You agree that you will not assign this Agreement or any of your rights or duties hereunder to any person or entity. The Company may assign this Agreement only to a successor or subsidiary of the Company unless the Company obtains your consent. The Agreement will be binding on heirs, personal representatives, successors and assigns of each party, and the obligations hereunder will survive termination of the Agreement or your employment.

G. Other Obligations. You represent and warrant to the Company that your signing of this Agreement and the performance of your duties and obligations hereunder does not and will not constitute a breach or event of default under the terms of any other agreement to which you are a party or by which you are bound. You agree that you will comply with and not breach the provisions of any prior employment or independent contractor agreement by which you are or were bound, including but not limited to any provisions relating to the non-disclosure of trade secrets or proprietary information, the solicitation (or non-solicitation) of customers, professionals or employees, or restrictions against competition. You have no outstanding obligations to former employers or former brokerage firms with which you were associated, except:

☐ NONE.

_____   _____

_____

H. Governing Law. This Agreement is governed by the law of the state in which the Office is located, set forth below.

IN WITNESS WHEREOF, this Agreement has been signed by you and the Company as of the date written on the top of the first page.

PROFESSIONAL,                        GRUBB & ELLIS COMPANY, OR ITS
                                     WHOLLY OWNED SUBSIDIARY:

_____      _____
        signature                    BY _____
_____              signature
        print name
                                     _____
                                             print name
OFFICE
                                     TITLE_____
_____
                                     MARKET AREA OF THE OFFICE:
_____
[street address] or such other address
as you are notified by the Company   _____
DEPT._____      [name of one or more counties]

# ADDENDUM TO
# GRUBB & ELLIS REAL ESTATE PROFESSIONAL
# EMPLOYMENT AGREEMENT

This is an Addendum (the "Addendum") to the Grubb & Ellis Real Estate Professional Employment Agreement (the "Agreement") entered into as of _____ between GRUBB & ELLIS COMPANY, a Delaware corporation, or its subsidiary named below (the "Company") and _____ ("you"). The effective date of this Addendum is _____ (the "Effective Date"). You and the Company will be referred to in this Addendum as "we." Except as the Addendum modifies the Agreement, the Agreement will remain in full force and effect according to its terms.

1.  DEFINED TERMS. All terms used in this Addendum will have the same meanings as defined terms in the Agreement.

2.  TERM OF THIS ADDENDUM. The Company may terminate this Addendum and substitute a new Addendum at any time upon 30 calendar days' advance written notice to you. If you do not sign the new Addendum by the date of termination of this Addendum, your employment may be terminated.

3.  THE DUTIES OF YOUR POSITION. A new sentence is added to Paragraph 3.A of the Agreement to read as follows: Beginning with the _____ calendar year (the "Calendar Year"), your annual Gross Production Goal will be $_____.

4.  COMPENSATION. In addition to the terms of Paragraph 6 of the Agreement:
    Addition to Paragraph 6.A:

(i)  Commissions. The schedule referred to in Paragraph 6 of the Agreement consists of the Standard Program and the Advanced Commission Program which are effective on and after January 1, 2001. Unless you qualify for the Advanced Commission Program, you will be paid according to the Standard Program set forth below. Within each calendar year, you can also qualify for higher brackets ("Accelerated Brackets") based upon your production that year.

(ii)  Advanced Commission Program. The determination of whether you qualify for the Advanced Commission Program is made at the beginning of each calendar year. To qualify, you must have been credited with cumulative gross commissions actually paid to the Company in excess of the Advanced Qualifying Earnings Threshold of $750,000 during the three (3) prior calendar year period OR cumulative gross commissions in excess of $500,000 during the two (2) prior calendar year period. Otherwise, you will be paid under the Standard Program.

| Standard Program | |
|---|---|
| Calendar Year Gross Production Earned | Participation Rate |
| <$250,000.00 | 50% |
| ≥$250,000.00, <$500,000.00 | 55% |
| ≥$500,000.00, <$750,000.00 | 60% |
| ≥$750,000.00 | 65% |

| Advanced Program | |
|---|---|
| Calendar Year Gross Production Earned | Participation Rate |
| <$250,000.00 | 50% |
| ≥$250,000.00, <$500,000.00 | 60% |
| ≥$500,000.00, <$750,000.00 | 65% |
| ≥$750,000.00, <$875,000.00 | 70% |
| ≥$875,000.00 | 75% |

Addition to Paragraph 6.D (Reimbursement of Expenses):

(iii)    Telephone Allowance. If you were credited with at least $150,000 in gross commissions actually paid to the Company in the previous calendar year, you will receive a monthly allowance of up to $75.00 per month, for the use, in connection with Company business, of your home telephone, cellular telephone and/or pager. If you have qualified for the Advanced Commission Program, this allowance is up to $150 per month. Telephone expenses, up to the maximum amount of the allowances permitted, will be reimbursed at the rate of 50% of actual expenses.

5.    THIS IS THE WHOLE AGREEMENT. This Addendum and the Agreement supersede any prior written or verbal written understandings or agreements between you and the Company on the subjects covered hereunder. If any part of this Addendum is inconsistent with any provision of the Agreement other than Paragraph 2 of the Agreement, the terms of this Addendum will prevail. Changes to this Addendum must be in writing and must be signed by an authorized representative of the Company (either your supervisor or his/her superior) to be effective.

IN WITNESS WHEREOF, this Addendum has been signed by you and the Company as of the Effective Date.

PROFESSIONAL

GRUBB & ELLIS COMPANY, OR ITS WHOLLY OWNED SUBSIDARY:

BY: _____

BY. _____

_____
(Print Name)

_____
(Print Name)    RAYMOND T. O'KEEFE
                                            PRESIDENT

_____
(Title)

Designation No. 29

# GRUBB & ELLIS COMMERCIAL INDEPENDENT CONTRACTOR AGREEMENT

This agreement ("Agreement") is entered into by and between GRUBB & ELLIS NEW YORK, INC. (hereinafter "G&E"), and

_____ (hereinafter "Salesperson"). G&E is

duly qualified and licensed and engaged in business as a real estate broker. Salesperson is duly licensed in the State of

_____ to act as a real estate salesperson pursuant to license I.D. number

_____ which expires on _____.

Salesperson's social security/tax I.D. number is _____. In consideration of the

promises and mutual agreements herein contained, it is hereby understood and agreed as follows:

## 1.   INDEPENDENT CONTRACTOR

This Agreement does not constitute a hiring by either party. It is the intent of the parties that, except to the extent explicitly prohibited by law, Salesperson shall be an independent contractor in relationship to G&E and that no employer-employee relationship shall exist or be construed to exist between the parties to this Agreement. This Agreement shall not be construed as a joint venture or partnership, and G&E shall not be liable for any joint venture or partnership obligation incurred by Salesperson. Salesperson shall have no authority to bind G&E by any promise or representation unless specifically authorized by G&E in writing with respect to a particular transaction.

## 2.   DUTIES AND OBLIGATIONS

A.      G&E agrees to make available to Salesperson information concerning current commercial listings in the office designated herein. G&E agrees to furnish advice, information and reasonable cooperation to Salesperson and further agrees to provide Salesperson with the non-exclusive use of the facilities of the office of G&E in connection with the subject matter of this Agreement, which office is now maintained at_____

_____

B.      Salesperson agrees to work diligently and with best efforts to promote the public interest in real estate transactions and services and to consummate through G&E and its affiliates all real estate brokerage and services activities available to Salesperson. Salesperson agrees that all listings of property, all representations of clients, and all other real estate brokerage and services opportunities encountered by Salesperson shall be taken and conducted in the name of G&E and/or its affiliates, subject to the written approval thereof, and Salesperson hereby contributes all rights and title to all such real estate brokerage and services opportunities to G&E and/or its affiliates for the use and benefit of G&E and/or its affiliates. Any such real estate brokerage and services opportunities which are not appropriate commercial real estate brokerage transactions (as determined by G&E from time to time in its sole discretion) shall be referred to the appropriate division and/or affiliate of G&E, if any, and Salesperson shall be compensated in accordance with the then current referral policy of G&E and its affiliates with respect to such referral. Salesperson shall not engage in any real estate brokerage or services activities which are not appropriate commercial real estate brokerage transactions other than to refer such brokerage or services opportunities to the appropriate G&E division or affiliate, if any.

C.      Salesperson shall abide by all of the guidelines and standards of G&E as published in the G&E Salesperson's Policies and Procedures Manual (hereinafter "Manual") and other writings from G&E, now existing and as amended or issued hereafter from time to time by G&E in its sole discretion. The Manual is deemed to be a material part of this Agreement and by this reference is incorporated herein. If there is any conflict between the Agreement and the Manual, the terms of the Agreement shall prevail. Salesperson has received a copy of the Manual, and his or her signature on this Agreement constitutes acknowledgement of receipt of the Manual.

D.      A conflict of interest may arise when Salesperson is involved in an activity, including a Dissociated Activity (see below), for personal gain that for any reason is in conflict with the business interests of G&E or its affiliates. Salesperson hereby agrees not to solicit or perform in competition with the business interests of G&E or its affiliates. Salesperson shall not use the resources or premises of G&E or its affiliates for any purpose other than to further the business interests of G&E and its affiliates. Salesperson agrees to abide by the conflict of interest policies of G&E and its affiliates as set forth in the Manual and/or as otherwise announced from time to time.

E.      Salesperson agrees to timely renew and/or otherwise maintain in good standing his or her real estate license, and failure to do so shall be a material breach of the Agreement. Salesperson shall pay for all professional licenses and dues. In the event Salesperson allows his or her license to lapse, it shall be the responsibility of Salesperson to reinstate the license and pay all costs related thereto, including fees or costs incurred by G&E as the result of the lapse or late renewal. No portion of any real estate commission will be paid to Salesperson for services rendered during any period during which Salesperson's license was not in good standing, and Salesperson agrees not to perform any services requiring a license at any time that Salesperson is not properly licensed.

F.      Salesperson agrees to maintain insurance on all vehicles utilized while performing duties described in this Agreement and all other insurance as specified in the Manual and to name G&E as an insured on all applicable policies of

insurance.   Salesperson shall indemnify, defend and hold harmless G&E for all unauthorized or negligent acts, omissions and/or representations by Salesperson in the performance of the duties enumerated herein and for all activities not directly required in the performance of such duties.

3.    COMPENSATION

A.   Commissions collected from the party or parties for whom services are performed shall be paid to G&E and a portion thereafter promptly paid to Salesperson in accordance with the Manual.   In no event shall G&E be liable to Salesperson for commissions not collected, nor shall Salesperson be entitled to any advance payments from G&E upon future commissions.   Salesperson shall not be personally liable to G&E for any commission not collected unless the claim thereto is released or otherwise compromised without the prior written consent of G&E.   G&E has the right to deduct all amounts owed to G&E by Salesperson from any commissions or other amounts payable to Salesperson by G&E.   If there is action pending or G&E reasonably believes action will be undertaken which involves Salesperson and which could require the expenditure of funds or repayment of commissions under this Agreement, G&E may escrow the funds in its own or in a third party account pending the resolution of the matter.   G&E shall not be liable to Salesperson for any expense incurred, nor shall Salesperson be liable to G&E for office personnel or expenses except as set forth in the Manual.

B.   In the event a dispute arises between Salesperson and any other G&E salesperson as to any matter related to the compensation to which either claims to be entitled, then Salesperson agrees that such dispute shall be resolved by the binding arbitration procedure described in the Manual.

4.    TRADE SECRETS AND WORK PRODUCT

Salesperson agrees that information and documents developed by G&E and its affiliates in the conduct of their real estate service businesses are trade secrets and/or proprietary information ("Trade Secrets"), including, without limitation, the following:   (i) the listings of any and all properties or interests therein or opportunities therefor, whether for lease, encumbrance, sale or other conveyance; (ii) the names and all other information concerning existing or potential clients; (iii) marketing, sales and other information included in any database developed by or on behalf of G&E or any of its affiliates; (iv) all of the papers, records, files, documents, and presentation formats maintained by G&E, its affiliates and/or Salesperson or other salespersons acting pursuant to this Agreement; (v) letters and other correspondence written on G&E stationery, and inter-office memoranda; (vi) mailing lists; (vii) manuals; (viii) forms; (ix) procedural information; and (x) other materials developed by G&E and its affiliates, or at their direction or under supervision or required to be maintained by the Manual or by the directives of management of G&E and its affiliates, all of which have been developed at substantial effort and expense by or for G&E and its affiliates.   Salesperson acknowledges and agrees that information acquired while Salesperson is associated with G&E is also a confidential Trade Secret and remains at all times the property of G&E and its affiliates.   Salesperson may utilize any information comprising Trade Secrets hereunder solely in the course of Salesperson's performance of this Agreement, but only in a manner that preserves any copyright, registration or confidentiality of such Trade Secret, and only after obtaining G&E's approval, which it may grant or withhold in its sole discretion.   The disclosure, removal or copying of any Trade Secrets other than in the ordinary course of the business of G&E without the express prior written consent of G&E shall give G&E the right to terminate this Agreement immediately, and shall entitle G&E and its affiliates to injunctive relief and/or punitive damages at its election.

All information and materials, including without limitation any Trade Secrets utilized by Salesperson or incorporated by Salesperson, or any other information and data, materials, procedures, manuals, programs and forms which Salesperson may develop in the course of business hereunder, shall constitute work product ("Work Product").   Salesperson represents that no portion of the Work Product, or its use or distribution, violates any right of any third party.   All of the Work Product shall belong exclusively to G&E and shall be deemed to be works made for hire.   Salesperson agrees to and hereby assigns to G&E the ownership of all of the Work Product.   G&E may obtain and hold in its own name copyrights, registrations and other protection that may be available with respect to the Work Product, and Salesperson agrees to use his or her best efforts to assist G&E in perfecting such protection.

5.    DISSOCIATED ACTIVITIES

A.      Any activities of Salesperson not directly required for the performance of the duties and obligations of Salesperson under this Agreement are deemed to be "Dissociated Activities".   Dissociated Activities include without limitation Salesperson's participation in any capacity other than that contemplated by this Agreement in any real estate, insurance, securities or other business activity engaged in for profit or any political, charitable, trade, professional or community organization.   No Dissociated Activities may be undertaken in the name of G&E.   No Salesperson shall, without prior written authorization from G&E, do any of the following in connection with a Dissociated Activity:   (i) use the name, assets or facilities of G&E or its affiliates in any form or manner whether publicly or privately; or (ii) make any representation, either affirmatively or by implication, that G&E or any affiliate thereof in any way participates in, supports or encourages such Activity.   Salesperson shall in all events expressly disclaim any interest in or participation of G&E, or any affiliate thereof, in any Dissociated Activities in such form as G&E reasonably requests from time to time.

B.      Salesperson shall at all times after request by G&E disclose and thereafter keep G&E fully informed of the nature and the extent of all Dissociated Activities of Salesperson, provided that Salesperson shall not be required to disclose any financial or similar information related to any such Activity which Salesperson is required in the course of such activity to keep secret and confidential.   G&E may terminate this Agreement if, upon written request by G&E, Salesperson does not

mo... fy or terminate any Dissociated Activity to the extent G&E, in its sole discretion, determines Salesperson's participation therein is in violation of this Agreement.

C.     G&E and its affiliates shall not have any liability or obligation for any liability incurred by Salesperson in connection with a Dissociated Activity. Salesperson shall defend, indemnify and hold harmless G&E and its affiliates and their respective officers, directors, shareholders, employees and agents from all actions, claims, damages, demands, losses, liabilities, causes of action, costs and expenses, including attorney's fees, of any kind arising out of or related to the Dissociated Activities of Salesperson. Salesperson shall notify G&E promptly of all relevant information relating to any such possible claim, demand, action or cause or action. G&E shall have the right to select, direct and discharge any attorney Salesperson is required to provide under this paragraph.

D.     Any consent by G&E, express or implied, to Salesperson's participation in Dissociated Activities shall not constitute approval or ratification by G&E of any act or omission of Salesperson in connection therewith.

6.     TERM - See Attached Addendum

A.     Neither this Agreement nor any conduct by G&E shall be construed to create a relationship between the parties for any set period of time or indefinitely. The term of this Agreement and the association created hereby shall continue until terminated by the first to occur of the following ("Termination Date"): (i) by either party hereto at any time and for any reason or no reason in the sole discretion of the terminating party upon thirty (30) days' advance written notice to the other; (ii) immediately by either party upon a material breach of this Agreement by the other party; or (iii) upon the death or legal incapacity of Salesperson. At any time after notice of termination regarding a Salesperson, G&E may cause Salesperson to leave the premises immediately and cease his or her association with G&E if G&E determines that such action is appropriate in order to maintain the normal and orderly business activity of the office, in which event the Termination Date shall be deemed to be the date so identified by G&E.

B.     Prior to the Termination Date, Salesperson shall deliver to the person designated by G&E all papers, manuals, records, files and documents constituting Trade Secrets and/or Work Product of G&E or its affiliates which Salesperson possesses or has the physical ability to obtain, and Salesperson shall advise such person of the whereabouts of such papers, manuals, records, files and documents which Salesperson does not possess or does not have the physical ability to obtain. Salesperson may retain copies of his or her personal files not constituting Trade Secrets and/or Work Product of G&E or its affiliates. In all events, Salesperson shall retain at the office of G&E to which Salesperson is assigned, for at least five (5) years or longer as required by law or G&E policy, the originals (or copies if originals are not available) of all listings, client representation agreements, purchase and sale agreements, leases, other transaction documents, canceled checks, trust records and other documents and records executed, obtained or maintained by Salesperson in connection with any transaction undertaken during the period of Salesperson's association with G&E not constituting a Dissociated Activity. Notwithstanding anything else to the contrary contained in the Agreement (including the Manual) or any other agreement made between Salesperson and G&E which does not explicitly waive this provision in writing, upon termination the full amount of all expenses then incurred which are the responsibility of the Salesperson hereunder or under any other agreement between G&E and Salesperson shall be paid immediately to G&E by Salesperson, and any such expenses incurred thereafter shall be paid by Salesperson immediately when incurred.

C.     For the purposes of this section, "Transaction" shall be deemed to mean (i) a bona fide written offer to purchase or exchange which has been accepted in writing, with or without contingencies, prior to the Termination Date, or (ii) a letter of intent or offer to lease, sublease or joint venture which has been accepted either orally (provided negotiations are substantially in progress) or in writing. "Closing" shall mean the consummation of the Transaction or close of the escrow or the execution of a lease, sublease or joint venture agreement. Salesperson shall not be entitled to be paid any compensation after the Termination Date for work performed prior to the Termination Date, except in the following situations:

(1)  When a commission has been earned by G&E and Salesperson by reason of the Transaction having closed, but payment therefor has not yet been received at the Termination Date; or

(2)  If (i) a Transaction (a record of which appears on any "Transactions in Process" or similar report submitted in writing to G&E no later than ten (10) days after the Termination Date) is closed within nine (9) months of the Termination Date; (ii) a Transaction is identified within ten (10) days after the Termination Date as one which will not close during such nine (9)-month period but instead within a reasonable time thereafter (and both Salesperson and his or her manager or assistant manager so indicated in writing); or (iii) a commission (the "option commission") is paid to G&E within nine (9) months following the Termination Date pursuant to the exercise of an option provided for under an earlier transaction for which Salesperson was initially paid a commission (the "earlier commission"), then Salesperson shall be entitled to receive a portion of the commission in accordance with the Manual (and in the case of an option commission on the basis of the earlier commission), but not in the "accelerated brackets" (regardless of any accelerated bracket in which Salesperson may be placed at the time of termination), reduced by the portion which G&E reasonably determines should be shared with any other salesperson of G&E who assists in the consummation of such Transaction.

In the event of the death or legal incompetence of Salesperson during the term of this Agreement or within ten (10) days after the Termination Date, the manager or assistant manager of Salesperson shall use reasonable efforts to identify the Transactions referred to in sub-section (2) above which will close after nine (9) months following such death or determination of legal incompetence.

7.    MISCELLANEOUS

A.    Purely as a matter of business judgment, G&E may elect from time to time to provide workers' compensation insurance with respect to Salesperson, and the provision of such coverage is not intended to reflect any relationship except that of independent contractor. Nothing contained in this Agreement shall be construed as creating any right of Salesperson to workers' compensation. If from time to time G&E, in its sole discretion, provides Salesperson or other salesperson(s) with any thing of value in excess of that which it is obligated to provide hereunder, Salesperson shall have no further claim or right thereafter to any such thing of value.

B.    Any notice required hereunder shall be deemed delivered to G&E when personally transmitted to the President of G&E by certified mail, postage prepaid, addressed to G&E at the corporate headquarters at One Montgomery Street, Suite 900, Telesis Tower, San Francisco, California 94104 (or the principal place of business of G&E if hereafter it is moved), and shall be deemed delivered to Salesperson when transmitted to the office of G&E to which Salesperson was/is assigned as shown on the records of G&E.

C.    Salesperson and G&E agree that any dispute between them regarding the subject matter of this Agreement shall be resolved by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, which rules are incorporated herein by reference, provided, however, that all persons nominated to be arbitrators shall be attorneys at law duly licensed to practice before the courts of the state where the arbitration is conducted. The arbitration shall be conducted in the metropolitan area in which the office to which the Salesperson is then (or was last, as the case may be) assigned. The arbitrator(s) must apply applicable law. Judgment upon the award entered by the arbitrator(s) may be entered in any court having jurisdiction thereof. Depositions may be taken and other discovery may be obtained during such arbitration proceedings to the same extent as authorized in civil judicial proceedings. The unsuccessful party shall pay the costs of conducting the arbitration. The prevailing party shall be entitled to recover its expenses and reasonable attorneys' fees incurred in the arbitration and any legal action to enforce the arbitration award from the other party. Notwithstanding this Section, all disputes between Salesperson and any other G&E salesperson regarding compensation to which either claims to be entitled shall be resolved by the binding arbitration procedure described in the Manual.

D.    Salesperson agrees that no activity on the part of Salesperson as an independent contractor shall in any way discriminate on the basis of race, religion, color, gender, age, disability, national origin or as otherwise prohibited by law. Salesperson agrees to comply with all applicable federal, state and local laws, ordinances, codes, rules and legal requirements the performance of this Agreement.

E.    This Agreement contains the complete understanding between G&E and Salesperson with respect to the subject matter hereto, supersedes all prior agreements, proposals and understandings, either oral or written, between the parties and shall be binding upon and inure to the benefit of the heirs, personal representatives, affiliates, successors and assigns of each of the parties hereto. This Agreement can be modified only by written agreement signed by the parties hereto. This Agreement is solely for the benefit of Salesperson and G&E and its affiliates, and there shall be no third party beneficiaries to this Agreement. This Agreement may not be assigned by Salesperson. G&E may assign this Agreement only to its affiliates or successor. The obligations of the parties under this Agreement shall survive any termination of the Agreement.

8.    DESIGNATION FOR TAX PURPOSES

Salesperson will not be treated as an employee for federal or state tax purposes with respect to services performed pursuant to this Agreement. Salesperson shall timely make all appropriate governmental filings and timely pay all federal, state and other taxes, fees and charges, and Salesperson shall defend, indemnify and hold harmless G&E and its affiliates and their respective officers, directors, shareholders, employees and agents from all actions, claims, damages, demands, losses, liabilities, causes of action, costs and expenses, including attorney's fees, of any kind arising out of or related to Salesperson's failure to timely pay such items or make such filings.

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto as of this _____ day of _____, 19 ____.

SALESPERSON                                              GRUBB & ELLIS NEW YORK, INC.

                                                         By: _____

_____                        Title: _____

_____
(Print Name)

Distribution:    Original:    Corporate Human Resources Dept.        Copy 1:   Sales Office File      Copy 2:   Salesperson

7cv820 REV. from 4efforms1912 (9/17/83)